### UNITED STATES *v.* CARPENTER *et al.*

*(Circuit Court, D. Tennessee. December 3, 1889.)*

1. ELECTIONS AND VOTERS—OFFENSES AGAINST ELECTION LAWS.
   If the officer and judges of election commit, or intentionally permit to be committed, at an election of a representative in congress, any act prohibited and made a misdemeanor by the state election laws, (Code Tenn. §§ 5730, 5732,) such violation of their duty constitutes an offense against the United States.

2. SAME—PRESUMPTION OF INTENT.
   The intent to affect the result of an election will be presumed when unlawful acts, which naturally or necessarily have that effect, are intentionally committed, or knowingly permitted, by those having charge of the election.

3. SAME.
   On indictment charging the officer and judges of an election with changing the ballot-box, and substituting another in its place, or permitting it to be done, a federal supervisor, whose character for veracity was impeached, testified that the ballot-box was changed during the dinner hour, which statement was denied by the two supervisors of election, by the two clerks of election, and by defendants. The same witness testified, and his testimony was corroborated, that at dinner-time he went out of the room where the ballot-box was kept; that just before voting was resumed, he was called to the door of the room; that during the dinner hour he asked several of defendants to allow him to look into the desk where the ballot-box was placed by one of defendants on adjourning for dinner, but that they refused. *Held* insufficient to warrant conviction.

4. SAME—BURDEN OF PROOF.
   On indictment of the officer and judges of election for violation of the election laws, in committing, or permitting to be committed, offenses prohibited by such laws, the prosecution is not required to show when, how, or in what precise manner or place, the alleged offenses were committed, but only to satisfy the jury, beyond a reasonable doubt, that they were in fact committed.

5. SAME.
   Where a number of voters testify that they voted a certain ticket, and the returns show that a less number of votes were counted and returned as the vote for such ticket, it is incumbent on the judges and officers of the election to explain the discrepancy.

6. SAME—EVIDENCE.
   On indictment charging the officer of election with changing, altering, destroying, or unlawfully counting ballots, it is not necessary for a conviction that the jury find the particular number of ballots so changed, the number being immaterial.

On Indictment for Violation of the Election Laws.

Ed Carpenter, officer of election, and Joe Williams, John Catron, and Plummer Thompson, judges of election, were indicted for violation of the election laws. N. Shadinger, the witness referred to in the charge, was one of the federal supervisors.

*S. W. Hawkins,* U. S. Atty., *W. W. Murray,* and *John E. McCall,* Asst. U. S. Atty.

*Gant & Patterson, Clapp & Beard,* and *J. J. Duprey,* for defendants.

JACKSON, J., (*orally charging jury.*) The discussion of this case has taken a very wide range,—much wider than was warranted by the evidence. The court did not interrupt counsel, for fear it might do some injustice, and because of the assurance it felt that an intelligent jury, under the instruction of the court, would readily and promptly eliminate and discard all matters and considerations that were foreign to the merits of the case, as disclosed by the evidence. It is proper now for the court to briefly call your attention to some of the irrelevant and foreign matters which have been referred to in argument, and which should be excluded from your consideration in making up your judgment as to the guilt or innocence of the defendants.

Counsel for the defense have commented upon the fact that Plummer Thompson, the colored judge of the election, is not put upon trial with the defendants, and the suggestion is made or intimated that there was some political reason for this. Thompson was regularly indicted with the other judges and officers of the election. His name appears in the indictment as one of the parties charged with the offenses therein set forth. When the case was called for trial, Thompson, who was out on bond or recognizance, did not appear. He was called, and forfeited his recognizance; and a *capias* was ordered by the court for his arrest. Thompson not being present, the trial proceeded as to the other defendants who were present. In the midst of the trial, and after a large number of witnesses had been examined on behalf of the government, Thompson made his appearance, and gave the court a satisfactory excuse why he was not present when the case was called for trial. Not having been represented by counsel, the court could not then, and at that stage of the case, put him upon his trial with the other defendants. This course would have been taken by the court, if it could properly have done so. But the fact that Thompson is not now on trial in no way prejudices the defendants. It tends in no way to establish either their guilt or innocence of the offenses charged against them, and the jury should dismiss that matter from their minds. It is wholly immaterial.

It is further suggested by counsel for the defense that this prosecution is in some way connected with the pending election contest between the candidates for congress in this district; that one of said contestants, or somebody in his interest, is the power behind the throne, prompting this suit; and that it is intended to have a bearing upon that contest. Gentlemen of the jury, there is nothing in the testimony to warrant that sug-

gestion, and it is wholly foreign to the merits of this case. That contest between the candidates for congress at the last election is pending before another forum, on different evidence; and the result of this trial cannot properly have any effect or bearing upon it, one way or another. That suggestion should be entirely dismissed from your minds. It should have no influence on your verdict in this case.

Counsel for defendants have furthermore sought to impress upon you the fact that some great and vital question, other than the guilt or innocence of the defendants on trial, is involved in this suit. This is a mistake, gentlemen of the jury. In the trial and proper disposition of this case upon the evidence, neither the court nor the jury have anything to do with the race problem, or with the question of suffrage. The colored man has been regularly invested with the right of suffrage. The constitution of this state confers the right to vote without restriction, upon all male citizens, 21 years of age, who have resided 12 months in the state and 6 months in the county in which the right of suffrage is exercised. The colored man has the benefit of this constitutional provision; and when he has resided in the state and county the requisite period he has the same right, before the law, to cast his vote, and have it properly counted, that you and I have. This trial in no way involves the consideration of the policy or impolicy of conferring this high privilege upon the colored population. We have to deal simply with the facts of this case, under the law as we find it established. When, therefore, you come to the consideration of this case upon its merits, you should not allow any of those suggestions of counsel to have any weight or influence upon your minds. Let them be laid aside as wholly foreign to the question at issue, which must be considered and determined strictly upon the evidence introduced before you. The testimony, with such reasonable deductions as may be properly drawn therefrom, should alone be looked to in reaching your conclusion, and arriving at your verdict.

There are other suggestions, not warranted by the evidence, to which the court will call your attention later on.

But little need be said as to the law applicable to this case. Congress has, by various acts, so far adopted the election laws of the several states as to make all frauds and offenses committed against those laws offenses against the United States, when committed in any election at which a representative in congress is to be voted for. The constitutionality of this legislation has been fully established by the highest tribunal in the land. It is not controverted that at the election held on the 6th day of November, 1888, in the fourth civil district of Fayette county, Tenn., at Garnett's store, a representative in congress was to be, and was, in fact, voted for. If, at that election, the defendants, or either of them, committed or permitted any acts prohibited or made misdemeanors by the state law, such violations of their duty as judges and officers of said election will constitute offenses against the United States.

The indictment in this case sets out in proper form that the defendants were guilty of the following offenses at said elections: The first

count charges them with putting into the ballot-box used at said election votes or ballots not cast or given by any voter; the second count charges them with permitting ballots that were not actually cast to be put into the ballot-box; the third count charges them with wrongfully taking or throwing out votes that were put into the ballot-box; the fourth count charges them with knowingly permitting votes or ballots to be taken out of the box; the fifth count charges them with unlawfully taking out and destroying votes that were cast and put into the ballot-box; the sixth count charges them with wrongfully taking certain ballots out of the ballot-box, and putting in their place, in said box, other ballots, that were never voted; the seventh count charges them with permitting certain ballots to be taken out of the ballot-box, and others to be put therein, in place of those taken out; the eight count charges them with substituting another for the right ballot-box; and the ninth count charges them with permitting another to be substituted for the right ballot-box. By sections 5730 and 5732 of the Code of Tennessee, such acts, done or permitted by judges and officers of elections, are made misdemeanors. The indictment alleges that the several offenses charged were done or permitted by defendants, for the purpose, and with the intent, of affecting the election, or the result thereof. The intent thus charged need not be shown by direct or positive evidence. It may be presumed from the doing of the wrongful, illegal, or prohibited act. The law presumes that every man intends the natural consequences of his acts, intentionally done. Wrongful acts, knowingly or intentionally committed, can neither be justified nor excused on the ground of innocent intent. The color of the act determines the complexion of the intent. In the investigation of human affairs, whether connected with contract or crime, we are constrained to infer the motive from the act. The intent to affect the result of the election is properly presumed when unlawful acts, which naturally or necessarily have that effect, are proved to have been intentionally committed, or knowingly permitted, by those having charge of such elections. So much as to the question of intent.

While the offenses thus charged against the defendants have, from their very nature, called for and required the introduction of evidence to some extent political in its character, it would be in the highest degree improper and reprehensible for the court or jury to allow any party or personal sympathy or prejudice to either bias or control their judgment or action in honestly considering and fearlessly deciding the case on its merits, and as its merits are established by the evidence, to which alone we can rightfully look. To consciously permit either personal or party considerations to control our actions or conclusions in the case would be to disregard the obligation of our oaths, and render us unworthy of the positions we respectively occupy. Let all party affiliations, sympathies, and prejudices be studiously laid aside, gentlemen of the jury, and let the question of the guilt or innocence of the defendants be investigated and determined alone upon the evidence that has been introduced before you. In weighing and considering this evidence, you

should endeavor to reconcile and harmonize it, if you can.  When this cannot be done, you must determine for yourselves what portion of the conflicting testimony is most worthy of belief.  The court can only give you a few general rules, as guides for weighing and deciding between testimony that cannot be reconciled.  You should look to the circumstances surrounding the respective witnesses, and to the way in which they testify, in considering the weight to be given their testimony; to their means of information and opportunity of knowing the facts whereof they speak; to their relationship to the parties.  A witness, although not directly interested in the result of the suit, may be strongly biased by his connection with or relationship to the parties or to the litigation; and you should determine how far, if at all, such connection or relationship has biased, controlled, or influenced such witness or witnesses in his or their testimony.  You should also consider the manner and bearing of the witnesses in testifying.  Do they show a zeal in stating facts favorable to one side, and reluctance in disclosing facts that would benefit the other?  Do they testify in that frank, candid, and straightforward way which a witness should do, under the solemnity of an oath?  Or do they evade, and equivocate?  You should also look to the consistency of their testimony.  Which witness is most consistent with himself, and which is contradicted by himself?  Which is most consistent with undisputed or well-established facts, about which you have no doubt?  Which is corroborated or contradicted by other witnesses, who you are satisfied have told the truth?  You should especially look to the interest which the respective witnesses have in the suit, or in its result.  The rules and principles of evidence are founded, in a peculiar degree, upon practical good sense, and spring out of an enlightened view of human nature.  Where the witness has a direct personal interest in the result of the suit, the temptation is strong to color, pervert, or withhold the facts.  The law permits the defendants, at their own request, to testify in their own behalf.  They have availed themselves of this privilege.  This testimony is before you, and you must determine how far it is credible.  The deep personal interest which they have in the result of the suit should be considered by the jury in weighing their evidence, and in determining how far, or to what extent, if at all, it is worthy of credit.

. Taking these general rules and suggestions as guides, it is for you, gentlemen of the jury, to apply them to the evidence introduced before you, and determine what portions of the testimony you consider most reliable and trustworthy, where such testimony is conflicting.  Your every-day experience may be applied in analyzing and placing an estimate upon the statements made by witnesses, and in determining which side of conflicting and contradictory testimony best harmonizes with the truth or the actual facts; and, having thus satisfied your reason and conscience, your duty will be to act in accordance with the conviction thus produced.  When credible witnesses testify to a fact or facts about which there is no conflict in the testimony, then your plain and mani-

fest duty is to give credit to such witness or witnesses, and consider such fact or facts as established, and follow the same to its or their logical results.

Of all the witnesses who have testified before you, only one has been directly impeached, and his credibility attacked. Several credible witnesses on the part of the defense have sworn that N. Shadenger's reputation for truth and veracity was bad; that he was unworthy of belief; and that they would not believe him on oath, in a court of justice. On this testimony, if you believe it, you have the right to discredit all that Shadenger has stated, except in so far as he is corroborated by the testimony of other witnesses, whom you do believe. To the extent that his statements are corroborated by other credible testimony, you should not discredit him, although he has been generally impeached. The court will briefly enumerate some of the points in which Shadenger has been corroborated by other witnesses. He stated that the certificate which he signed in reference to the election was upon a separate sheet, and not attached to the returns made by the officers holding the election. The production of the original returns confirms this statement. He states that he went out of the room in which the election was held, and the ballot-box was kept, at or about dinner-time. Several witnesses corroborate this statement. He testified that just before the voting was resumed, after dinner, he was called to the door of the room by Esquire Garnett, and asked to point out his horse, so that Garnett could have him put up and fed. In this he is corroborated. He testified that during the dinner hour he asked to look into the desk in which the ballot-box was placed by Williams, one of the defendants, when they adjourned for dinner; that he asked Williams for the key, for that purpose; that, failing to get the key of the desk from Williams, he applied to Garnett; that Garnett told him the judges, or one of the boys, had the key; that he also spoke to the defendant Carpenter about the key, and failed to obtain it, etc. In these several statements he is corroborated, and it is for you, gentlemen of the jury, to weigh and consider the bearing of the facts thus stated. Shadenger further states that, in his conversation with defendant Carpenter about the key, and his desire to look in the desk, said Carpenter used threatening language towards him, which intimidated and forced him to abandon his efforts to ascertain what was in the desk, where the ballot-box was placed during the adjournment for dinner. This statement as to threats is denied by Carpenter. It is for you to determine which of the two you will believe. Shadenger further testified that during the adjournment for dinner the ballot-box was changed. There is no direct testimony corroborating him in this statement; and the testimony of Garnett; of Rhea, the other supervisor; of Wilson and Maxwell, the clerks of the election, —to say nothing of the testimony of the defendants,—tends strongly to negative the fact stated by Shadenger. The corroborated statement of Shadenger may excite suspicion; but, in view of the discredit placed upon Shadenger's character, and of the testimony of the other witnesses, denying that there was any change of the ballot-box, the court is of the opinion, and so instructs you, gentlemen of the jury, that the evidence

is not sufficient to warrant a conviction upon the eighth and ninth counts of the indictment, which charge the defendants with changing, and permitting the changing, of the ballot-box; and you should render a verdict of not guilty on said counts.

In respect to the other counts of the indictment which have been enumerated, and which, it is conceded, charge offenses against the law, the court calls your attention to the fact, and instructs you, that the government is not bound to show, nor are you required to find, the exact mode or manner in which the fraudulent acts charged were done or permitted, if they were actually done or permitted. The material question is, were they, or any of them, done, or permitted to be done, by these defendants, or either of them? It is no part of the prosecution's case to show when, how, or in what precise manner or place, the alleged offenses were committed. If the evidence satisfies you, beyond a reasonable doubt, that the fraudulent acts, all or any of them, as charged in the indictment, were committed or permitted by the defendants, or either of them, it will be no part of your duty to ascertain or be satisfied as how, or when, or in what exact way, the thing was accomplished by the guilty party or parties. Fraud can rarely be established by direct testimony as to the precise manner of its accomplishment. Its perpetrators do not admit witnesses to the overt act. And it is no part of the jury's province or duty, in this case, to inquire into, or to be satisfied as to, the method or plan adopted and employed in accomplishing the fraudulent acts charged, if the evidence convinces you, beyond a reasonable doubt, that they were done or permitted by the defendants, or either of them. The material question for you to determine is, were all or any of the offenses charged committed or permitted by all or either of the defendants? If republican tickets or ballots were by voters handed to the officer holding the election, and, instead of depositing such tickets or ballots in the ballot-box, he should substitute democratic tickets, and put the latter into the box, that would be a fraudulent and criminal act, covered by one or more of said counts of the indictment. If such election officer, or the judges of the election, when the votes came to be counted, should call out the names of democratic candidates from republican ballots or *vice versa*, that would be the fraudulent substitution of one ticket or ballot for another, and would constitute an offense, as charged in the indictment. If ballots that were cast are taken out of the box, and others, not voted, are placed therein, this would also be a gross violation of the law. Any wrongful changing or destruction of the ballots, any intentional failure to count the votes as actually cast by the voters, and only those, is an offense against the election laws, and comes within the counts of the indictment upon which the defendants are being tried.

The evidence relating to the first seven counts of the indictment, charging the defendants with doing, or permitting to be done, fraudulent acts, of the character above described, at the election held November 6, 1888, in and for the fourth civil district of Fayette county, may be briefly reviewed by the court, with such comment thereon as may be legitimately made, without encroaching upon the province of the jury. In such

statement of and comment upon the testimony as the court may make, the jury will understand that it is not the intention of the court to usurp their functions, or to control their judgment. It is for the jury to determine what facts are established by the testimony, and what conclusions they will draw from such facts. But, while leaving this duty and function to the jury, the court may properly restate the testimony bearing upon the material points in the case. Several witnesses testified that the voting population of the fourth civil district of Fayette county, on November 6, 1888, numbered between 490 and 500,—say about 500; that from 80 to 100 of such voters were white men, and Democrats; that remainder, numbering about 400, were colored men, and Republicans; that on the day of the election there was a large turn-out of such voters; that the colored voters present exceeded 300 in number. John McGowan, the Republican chairman of the district, states that there were over 300 colored Republican voters present; that he directed many or most of them to go for their tickets to John C. Reeves, who occupied a position 10 or 20 steps from the voting place, and was distributing Republican tickets to Republican voters; that Reeves' position was in full view of the window at which the ballots were handed in to the election officers; that he saw many of such tickets deposited or handed in to officers holding the election, but cannot swear to the exact number that actually voted such Republican ticket. John C. Reeves testifies before you that he was present; that he had in his possession Republican tickets, a sample of which is produced and exhibited in evidence, having on it a full list of Republican candidates, from presidential electors and congressmen down to state and county officers; that he issued to the colored voters on that day, upon their application for the same, 325 of those tickets, while at the voting place; that on his way home he met 4 or 5 other voters going to the polls, to whom he gave Republican tickets. The names of 2 of these voters he finds upon the poll-list, at Nos. 407 and 409. Reeves further states that he saw over 100 of those to whom he gave such tickets go directly from him to the window where the votes were received, and hand them in to the officer holding the election. He could not swear that they actually deposited the identical ticket received from him, but he saw no change of ticket or change of purpose on the part of the voters after procuring from himself the Republican ticket. He recognizes and identifies on the poll-list the names of about 100 of such Republican voters. Now, gentlemen of the jury, Reeves and Mc-Gowan are in no way impeached, nor are their statements in any wise contradicted. They stand before you as in every way credible witnesses, and their testimony is entitled to full faith and credit. If the case for the prosecution stopped with the testimony of Reeves and McGowan, it would present a case of circumstantial evidence as to the vote actually cast having exceeded that which was counted and retained by the election officer and judges. Where circumstantial evidence is relied on to convict, as counsel for defendants have urged, it should be of such conclusive character as to exclude every reasonable hypothesis of innocence.

But the government's case does not stop with the circumstantial evi-

dence detailed by Reeves and McGowan. In addition to their statements, 108 witnesses, exclusive of N. Shadenger, have, one by one, separately testified before you that on the day of said election they got from Reeves Republican tickets; that they each voted such ticket just as it was received from said Reeves, without in any way scratching or changing the same. Besides these 108 witnesses, Allen Dodson states he voted a straight Republican ticket, which he got from Dave Bowlan, which differed somewhat in appearance from those issued by Reeves. With the exception of said Dodson, the other 108 witnesses, exclusive of Shadenger, come before you, and severally state that the ticket which they respectively voted on the 6th November, 1888, in said fourth district of Fayette county, was received from Reeves; that they each voted such ticket just as it was received by them, without change or alteration of any kind; that they handed such ticket to the officer holding the election, many of them stating that defendant Carpenter was the person to whom the ticket was delivered at the time of voting. The names of each of these 108 witnesses, together with that of Allen Dodson, appear upon the poll-list of the election, which is introduced in evidence. It is thus shown that these 109 witnesses actually voted at said election. They each identify the kind of ticket they respectively voted, by showing from whom they received the same, and that after receiving such ticket they voted it without change or alteration. These witnesses are not impeached, or in any way discredited. They stand before you as credible as any that have testified. They, in some instances, make mistakes in saying that Harrison's name was on their ticket, and fail to remember other names that were on it. But intelligent witnesses for the defense, like Esquire Mat Rhea, make similar mistakes when they say that Cleveland's name was on the ticket they voted, and also fail to remember the names of the different candidates voted for. This is not material. The controlling fact to be ascertained from the evidence is, did these 109 witnesses for the prosecution vote the Republican ticket which they received from John C. Reeves? The witnesses swear directly and positively to the fact,—a fact resting upon their own act, and within their own knowledge. This is not circumstantial, but positive, evidence; and, if the witnesses are believed, the fact is established that at least 109 Republican votes were cast at that election in said district. The testimony of these 109 witnesses, swearing directly and positively to this fact, cannot be properly disregarded by the jury, because such witnesses, not having been impeached or contradicted, stand before you as credible as any that have testified. If the prosecution had simply shown that each one of these witnesses was seen going to the polls with a Republican ticket in his hand which he had received from Reeves, with a declaration of his intention to vote such ticket, such facts and acts would have constituted circumstantial evidence that they voted such ticket. But when the voter, in person, comes before you as a witness, and swears that he put into the ballot-box, or handed to the officer holding the election, the identical ballot that he received from Reeves, that is not circumstantial, but positive, testimony, and establishes the fact, if the witness is cred-

ible; and, unless impeached, or directly interested in the result of the suit, all witnesses are deemed credible. The jury should give to such positive testimony its due weight and consideration, and the fact or facts thereby established should be followed out to their logical result.

Counsel for defendants, in answer to this direct testimony, showing or tending to show at least 109 Republican votes actually cast, has suggested that the Republican candidate for congress, in connection with John C. Reeves, perpetrated a fraud upon the voters of said district, by placing in the hands of said Reeves tickets with a Republican heading, but with Democratic candidates' names thereon, and that those fraudulent tickets were the ones Reeves actually issued. There is no testimony whatever to warrant such a suggestion. Such an act or fraudulent conspiracy would involve a gross violation of law, and would constitute a criminal offense, and the jury are not at liberty to infer, upon the mere suggestion of counsel, that other parties have committed a crime, in order to shield defendants from the consequences of acts which the evidence tends to establish against them. The jury may not indulge in any such presumption of guilt against others, not on trial, in order to relieve defendants, whose guilt or innocence must be found from the evidence before the jury, and from that alone.

It is further suggested by counsel for the defense that these 109 voters were, before or after receiving their Republican tickets, bought up, and for a consideration were induced to destroy the tickets received from Reeves, and vote Democratic tickets. This suggestion is open to the same observation and objection as the other. It is not supported by any testimony. It invokes the presumption of a criminal offense committed by unknown parties, upon the mere suggestion of counsel. The jury are not warranted in giving any weight to this suggestion. The force of the evidence against defendants, whatever it may be, cannot be broken by indulging in any such presumption.

It is also suggested that, if votes of said witnesses were actually cast as they have testified, some person or persons other than these defendants have tampered with the ballots, and produced the results shown by the returns; that, if ballots were changed, destroyed, or wrongfully counted, some one else committed the offense and not these defendants. Is there any evidence before you to support this theory? The court can recall none; and you cannot properly, in the absence of testimony tending to establish the fact, indulge in any such presumption. It is shown that the ballot-box was in the exclusive and continuous possession and custody of these defendants and their associate, Plummer Thompson, the Republican judge of election. The defendant Carpenter, as the officer holding the election, received the ballots as cast, and called off the votes from the tickets when the votes were counted. The returns made by him and the judges of said election show that only 43 Republican votes were cast or counted at said election. You have the positive swearing of the witnesses, exclusive of Shadenger, who cast 109 Republican ballots at said election. If you believe the testimony of these witnesses, the fact is established that least 109 Republican ballots were delivered to and received

by the defendants, or by the defendant Carpenter, as the officer holding said election. If received, why were they not found in the ballot? Or, if found therein, why were they not counted? If these 109 ballots reached the defendants' possession and custody, it is incumbent upon them to give you some reasonable explanation of how it happened that only 43 were counted out and returned as the Republican vote. Such reasonable explanation of this discrepancy is not furnished by the suggested theory, that somebody, without the knowledge or permission of defendants, tampered with the ballot-box, and changed the votes. When the evidence brings home to the defendants, or either of them, a controlling fact, such as the actual receipt of a larger number of Republican votes than were counted or returned by them, the duty rests upon them of showing how such a discrepancy has occurred. Responsibility for the result rests upon them until it is shown by evidence that the fraud was committed by others, and without their knowledge or permission, tacit or express. If you find that the defendants, or either of them, changed, altered, destroyed, or wrongfully counted any ballots cast at said election, or permitted such acts to be done by others, you are not required to find what particular number were thus changed, altered, destroyed, or wrongfully counted. The number of ballots fraudulently tampered with is not material. If 10 or 100 or 109 are fraudulently changed or destroyed, the offenses charged are as effectually committed as though such changes amounted to 1,000,000. If the evidence satisfies your minds that some one of the defendants committed or permitted the frauds charged, and that the others had no knowledge of or connection with such fraudulent acts, you will return your verdict accordingly. You may find some guilty, and acquit others.

As already stated, the evidence, and that alone, must satisfy you, beyond a reasonable doubt, that the offenses charged, or some of them, were committed or permitted by the defendants, or some of them, in order to convict all or either of them. This needs some explanation, perhaps. In civil suits, mere preponderance of evidence will ordinarily turn the scales in favor of the party on whose side it exists; but in criminal cases, with the presumption of innocence which the law makes in favor of the prisoner on trial, something more is required than a mere balance or preponderance of proof against him, in order to warrant a conviction. Before returning a verdict of guilty, the evidence should be of such a character as to satisfy the judgment and conscience of the jury as to the guilt of the accused. If the jury can reconcile the evidence with any reasonable hypothesis consistent with the innocence of the defendant they should do so, and in that case acquit; or if, after weighing all the proof, and looking only to the proof, and the reasonable deductions to be drawn therefrom, the jury impartially and honestly entertain the belief that the accused may be innocent of the offenses charged against him, he is entitled to the benefit of that doubt. It is not, however, meant by this, gentlemen of the jury, that the testimony should establish the defendant's guilt to an absolute certainty, but merely that you should not convict, unless, from all the evidence, you believe the ac-

cused guilty beyond a reasonable doubt. While attempts to explain the term "reasonable doubt" do not usually result in making the subject any clearer to the minds of the jury, and while the court might content itself with simply saying that you must be satisfied from the evidence of the defendant's guilt beyond a reasonable doubt, in order to convict them, or either of them, of all or any of the offenses charged against them, still, as it is the general practice of courts conducting criminal trials to give some illustration or explanation of the character of the doubt which may be deemed reasonable, the court will say, for your instruction and guidance, that speculative notions, theories, or possibilities, resting upon mere conjecture, not arising out of or deducable from the proof, should not be confounded with what is meant by a "reasonable doubt." A doubt suggested by the ingenuity of counsel, or by your own ingenuity, not warranted by the testimony, or arising out of its insufficiency; or one born of lenient inclination or disposition to permit the defendant to escape the penalty of the law; or one prompted by sympathy for the defendants, or those connected with them by ties of relationship or party; or one arising out of opposition to the law sought to be enforced,—is not what is meant by a "reasonable doubt." On the contrary, a "reasonable doubt," as that term is employed in the administration of criminal law, is an honest, substantial misgiving, generated by the insufficiency of the proof; an insufficiency or uncertainty of the evidence, which fails to convince your judgment and conscience, and satisfy your candid reason, as to the guilt of the accused. If the whole evidence, when carefully examined, weighed, and compared, produces in your minds a settled conviction or belief of the defendants' guilt, such a conviction as you would be willing to act upon in matters of great importance, relating to your own affairs, you are free from any reasonable doubt, and should find and return your verdict in accordance with such belief. As already stated, it is not required either that the evidence shall establish, or that you should have, an absolute certainty of the defendants' guilt, but merely that degree of certainty or belief such as you would act upon in deciding upon and concluding your own transactions of great moment and importance. Having that sort or degree of conviction or belief with which you would enter upon transactions of great concern to yourself, such a belief as would lead you to feel safe in acting in matters or affairs of great moment, affecting your own personal or private interests, it cannot be said or considered that you had any reasonable doubt on the question at issue. If, however, the proof leaves your minds in such a state of uncertainty as to the guilt of the accused, as would deter you from acting in important matters which concern yourself, such a state of mental uncertainty and indecision would constitute a reasonable doubt. You may, therefore, in testing the character of the conviction or belief which the evidence has produced on your minds as to the guilt of all or either of the defendants, ask yourselves this question: "Would such a degree of conviction, certainty, or opinion as the proof in this case has made upon my mind be sufficient to induce or lead a prudent man to act upon

in a matter of great concern and importance to his own personal interest?" If you answer that question in the affirmative, then you cannot properly be said to have any reasonable doubt as to the guilt of the defendants. On the other hand, if the proof of guilt leaves your minds in a state of such uncertainty or want of conviction as would deter or prevent a prudent man from acting or proceeding in matters of great moment and concern to himself, that character of uncertainty or indecision would constitute a reasonable doubt which the defendants are entitled to have the benefit of.

Your verdict must respond to each count of the indictment, for the reason that each count contains a distinct and substantive charge or offense against the defendants. If you find the defendants guilty on all the counts, you will say, by your foreman: "We find the defendants guilty as ·charged in the indictment. " If you find then not guilty on any of the counts, you will return a general verdict of not guilty. If you find the defendants guilty on some of the counts, and not guilty on others, you will specify in your verdict the counts on which you find them guilty, and those on which you find them not guilty. If you find some of the defendants guilty as charged in all or some of the counts, you will return your verdict accordingly, naming such defendant, and specifying the count or counts on which you find him guilty.

I now leave the case in your hands, gentlemen of the jury, feeling assured that, from the close attention you have given the testimony as it was introduced, and from your ability and willingness to weigh it properly and fairly, you will return an honest, upright, and impartial verdict, and a true deliverance make between the United States and the accused.